# U. S. DISTRICT COURT.

RICHARD WARREN and EDWARD ROWE, assignees of EDMUND
P. SANGER and WALTER SCOTT, bankrupts, agt. THE
TENTH NATIONAL BANK of the city of New York, and
MATHEW T. BRENNAN, sheriff of the city and county of
New York.

The *United States District Court* will not sustain a bill in equity filed by the
assignees of involuntary bankrupts, to reach the proceeds of property in the
sheriff's hands, which property was levied upon and sold under judgments and
executions against the bankrupts issued out of a state court, in favor of *bona fide*
judgment creditors, who at the time of the levy had no reason to believe that
there was any fraud or collusion on the part of the bankrupts to evade the effect
of the bankrupt act, and thereby to give the creditors a preference.

On the argument several questions were argued and authorities cited, bearing on
the case, to wit :

1st. Whether the bankrupt court could render any decree which would be binding
upon the sheriff as to property or moneys in his official custody as an officer of
the state court ?

2d. Whether a bill in equity would lie in such a case, there being an adequate
remedy at law ?

3d. As to the question of intent to avoid the operation of the bankrupt law, to
prefer or to obtain preference, &c. (*See note at the end of the case*).

*Southern District of New York.*
THE facts sufficiently appear in the following opinion.

A. BLUMENSTIEL, *for the plaintiff.*
H. E. TREMAIN, *for the bank.*
J. STERLING SMITH, *for the sheriff.*

BLATCHFORD, J.—On a petition in involuntary bankruptcy
filed February 24th, 1871, in this court. Edmund P. Sanger
and Walter Scott were, on the 11th of March, 1871, adjudged
bankrupts. The plaintiffs were, on the 11th of April 1871,

appointed assignees, and an assignment in the usual form was executed to them on the 14th April, 1871.

The bill alleges, that on the 12th January, 1871, and within four months before the filing of the petition, the bankrupts being insolvent, with a view to give a preference to the Tenth National Bank of the city of New York, which then had a claim aginst them procured, or suffered their property to be seized on two executions, amounting respectively to $4,803 47, and $5,051 01 issued out of the supreme court of the state of New York, to the sheriff of the city and county of New York; that under such executions, the said sheriff did, on the 12th of January, 1871, levy upon and seize the property of the said bankrupts; that such executions were obtained upon actions brought in the said supreme court by the said bank, to which the bankrupts interposed no defense, and in which they suffered and permitted judgment for said sums respectively, to be entered against them on the 12th of January, 1871. That the sheriff, under the instructions of the bank remained in possession of the property, until after the filing of the petition; that on the 11th of March, 1871, an order was made by this court, that the property be sold under the direction of the sheriff, and that he hold the net proceeds of the sale subject to the further order of this court, that thereupon the property was sold at auction, and the net proceeds amounting to $8,910 57 were received by the sheriff who now holds the same under said order; that the bank refuses to release its alleged claim on the moneys and its alleged liens under the executions; that at the time of the entering of the said judgments, and of the issuing of the said executions, and of the said seizures thereunder, and of the said sales, the defendants, had reasonable cause to believe the bankrupts to be insolvent, and the executions and seizures thereunder were issued and made and procured, or suffered to be issued and made in fraud of the provisions of the bankruptcy act, and with a view to give the bank a preference and to prevent the property of the bankrupts from coming to their assignees

in bankruptcy, and to prevent the same from being dis-
tributed under the said act, and to defeat the object of and
impair, hinder, impede and delay the operation of said act,
and that the defendants, withhold and detain the proceeds of
the said property from the plaintiffs, with the intent and
object aforesaid, and in fraud of the said act. The bill prays,
that the said seizures and executions may be declared fraud-
ulent and void, that the plaintiffs may be declared to be
entitled to the posession of the property so seized or the value
thereof as assets of the bankrupts, and that the plaintiffs may
receive the same from the defendants. The bill was filed on
the 19th of April, 1871.

The question of fact principally contested in the proofs is,
as to whether the bank at the time the property of the
bankrupts was taken on the executions had reasonable cause
to believe that the bankrupts were insolvent, and that the
conveyance and transfer of the property of the bankrupts
made by such taking, was made in fraud of the provisions
of the act, by being made with a view on the part of the
bankrupts, to give the bank a preference or to prevent their
property from coming to their assignee in bankruptcy, or to
prevent the same from being distributed under the act, or to
defeat the object of, or in any way impair, hinder, impede,
or delay the operation and effect of, or to evade any of the
provisions of the act.

On the 23d of August, 1870, the bankrupts under their
firm name of E. P. Sanger & Co., made and delivered to one
William H. M. Sanger, their check dated that day, drawn
on the Central National Bank of the city of New York, pay-
able to the order of the said William H. M. Sanger, for
$4,891 64. On the 24th of August, 1870, they made and
delivered to said William H. M. Sanger a like check for
$4,651 37. These checks were indorsed and passed by
William H. M. Sanger to the defendants, the Tenth National
Bank. On presentment at the Central National Bank,
payment of them was refused. A suit was brought on each

of the checks against the makers and the indorsers. The summons and complaint in each of the suits were served on Edmund P. Sanger, on the 3d of November, 1870, and on Walter Scott, on the 29th of November, 1870. A judgment was entered against them in each suit, for want of appearance and of answer, or demurrer, and against William H. M. Sanger, on the 12th of January, 1871, the judgments being severally for the sums of. $5,051 01 and $4,803 47. On these judgments, the executions referred to were on the same day issued and the levies made.

When the deputy sheriff made the levies, he made a demand for the money. The debtors said in reply, that they did not have the money at that time, but expected to get it soon. The sheriff held possession for forty-five days of the property levied on, and it was then sold. The proceeds are in the hands of the sheriff. When the levies were made part of the property levied on, was already under attachments under process from a state court.

The firm of Sanger and Scott failed in September, 1870. It did not after that resume general payments of its debts, although it bought a few bills of goods for cash. It did not after that meet any of its obligations except those specially arranged for and absolutely necessary to carry on its business. It owed when it failed from $150,000 to $200,000. The reason why it did not pay the amounts claimed in the suits on the checks was that it did not have any money. A few days after the executions were levied, according to the bankrupt Sanger's testimony, he, in a conversation with the president of the bank, proposed to pay him $2,500 if he would withdraw the sheriff and vacate the judgments; but the president refused to do so, assigning as a reason that the bankrupts had not settled with all their creditors, and that the bank had to refuse in order to protect itself; but offered to take $3,000 in cash, and withdraw the sheriff, but not vacate the judgments. Sanger says that this offer was refused by the bankrupts, and that the same offers on both

sides were afterwards made, and refused several times. The president of the bank testifies that his offer was to take forty-five per cent. of the claims and withdraw the sheriff, and wait some time for the remainder. From the time it was so sued, the firm was not able to pay the demands sued on, and it was not, from September, 1870, able to pay its debts in full.

The checks referred to were received on deposit by the bank from William H. M. Sanger, who kept an account with it. After the checks were dishonored and before suit was brought on them, the president of the bank had an interview in regard to them with the two Sangers. The substance of the conversation was a request for the forbearance of the payment of the checks. One of the reasons assigned for the request was that Edmund P. Sanger was going on nicely with his business, and expected William H. M. Sanger, who was his brother, to provide for them, and that any pressure on the part of the bank would embarrass Edmund P. Sanger. By reason of promises made for an earlier payment or settlement, the bank refrained from bringing suit. The president was assured by William H. M. Sanger that his brother was in a most excellent condition; that the firm had failed, and had compromised some time previously, but was then going on nicely; and that it had a large stock of goods in process of manufacture, and as soon as the autumn business opened would be able to make satisfactory arrangements. After the suit was brought, the two Sangers urged very hard for an extension of time, and it was given.

The president of the bank testifies that the understanding he derived from his conversation with the bankrupt, Sanger, after the levies were made was, that the firm had, some time before, compromised with its creditors, at forty-five cents on the dollar, and that he had the same understanding when the suits were brought and the judgments were obtained, and was further informed, that the compromise would leave them a very handsome surplus; that they had no considerable

amount to pay until April, 1871 ; and that the prospect of their business was excellent. The president of the bank had no knowledge, until after the levies were made, of the existence of any prior attachment on any of the goods levied on. It does not appear that any officer of the bank, except the president, had anything to do with any of the transactions in question.

Notwithstanding the provision of the 35th section of the act, that, if the challanged transfer or conveyance is not made in the usual and ordinary course of business of the debtor, the fact shall be *prima facie* evidence of fraud, I do not see in this case any satisfactory evidence that the bank had any reasonable cause to believe that the debtors intended by suffering the executions to be levied to give the bank a preference. The bank was put on inquiry by the non-payment of the checks. It made inquiries, and made them in the most proper quarters, as to the status and prospects of the debtors, and as to their relations to other debtors, if any.

The evidence rebuts the presumption that the bank intended to obtain, or supposed it was obtaining, a preference over any creditor who had a subsisting enforceable claim at the time ; or that the debtors intended to, give the bank, or suffer it to have, any such preference; or that the bank had reasonable cause to believe that the debtors had any such intention or view. When the levies were made, the debtors were going on with their business. They continued it for six weeks afterwards before the petition against them was filed. It does not appear that the levying of the executions broke up their business, or suspended its continuance. Although the firm failed in September, 1870, and did not after that pay its debts in full, yet during the interval between that time and the levies, it was making compromises as its debts matured, at the rate of forty five cents on the dollar, to the satisfaction of those who so compromised, and as I understand the evidence, was disposing of its debts as they matured by such compromises. It does not appear that, at

the time of the levies, the bank had reasonable cause to believe that there were any creditors not compromised with, and over whom it could obtain a preference. What transpired after the levies were made cannot affect the rights of the parties. The question is as to what the bank had reasonable cause to believe at the time the levies were made.

It results, therefore, that the ʻbill must be dismissed with costs.

NOTE. Upon the argument of the foregoing case, it was contended upon the part of the sheriff, that the bankrupt court could not render any decree which would be binding upon the sheriff as to property or moneys in his official custody as an officer of the state court; that he was bound to account to that court for any property taken under its writ, notwithstanding any decision of the U. S. district court, that might be made; and that the latter court was powerless to arrest property from the officers of another court of competent jurisdiction. The following cases among others were cited upon this point during the argument (*Atkinson* agt. *Purdy*, *Crabbe*, 556; *Peck* agt. *Jenness*, 7 *How.*, *U. S.*, 625; *Johnson* agt. *Bishop*, 1 *Woolworth*, *C. C.*, 324; *Ex parte Schnepf* 2 *Ben.*, 72; *Irving* agt. *Hughes*, 2 *B. R.*, 20; *Diggs* agt. *Wolcott*, 4 *Cranch*, 119; also *In re Swarwout*, 4 *Cranch*; 1 *U. S. Stat. at Large*, 334, Sec. 5; *In re Bernstien*, 2 *Ben.*, 44; *Rowland* agt. *Baker*. 21 *Wend.*, 264).

It was also contended, that a bill in equity would not lie, there being adequate remedy at law (1 *U. S. Stat. at Large*, 80, *Sec.* 16; *Parsons* agt. *Bedford*, 3 *Peters*, 446; *Baker* agt. *Riddle*, 1 *Bald. C. C. R.*, 404; *Gorden* agt. *Hobart*. 2 *Snmn.*, 405. The cause of action alleged was cognizable at law prior to and subsequent to the judiciary act, both in England and the United States (*Thompson* agt. *Freeman*, 1 *Term. Rep.*, 155; *Singleton* agt. *Butler*, 2 *B & P.*, 283; 1 *Chitty on Plead.*, 113; 7 *B & C.*, 310; *Smith* agt. *Hodson*, 4 *T. R.*, 211; *Bloxam* agt. *Hubbard*, 4 *East.* 407; *Cooper* agt. *Chitty*, 1 *Burr.*, (a *leading case*); *Balm* agt. *Hutton*, 9 *Bing.*, 471; *Edwards* agt. *Scarsbrook*, 32 *L. J.* (*N. S.*,) Part 2 *p.* 45; *Whitmore* agt. *Greene*, 13 *M. & W.*, 104; *Atkinson* agt. *Purdy*, supra; *Beers* agt. *Place*, *N. B. R. p.* 150; 2 *Story on Const*, 579, *note*; *Roberts* agt. *Taliaferro*, 7 *Clarke*, (*Iowa*) 110).

As to the question of intent to avoid the operation of the bankrupt law, to prefer or to obtain preference, &c., there were cited or discussed (*Kohlsaact* agt. *Hoguet*, 5 *N. B. R.*, 159; *Hall* agt. *Wager*, *Ibid.*; *Black* agt. *Secor*, 1 *B. R.*, ,81, & 2 *Ben.*, 196; *In re Ken*, 2 *B. R.*, 124; *Haskell* agt. *Ingalls*, 5 *N. B. R.*, *Scorpe* agt. *Arnold*, 5 *N. B. R.*, 148; *Housberger* agt. *Zibelin*, 2 *B. R.*, 33; *Waller* agt *Best*, 3 *How.*, 111; *In re Weeks*, *Nat. B. R.*, *Vol.* 4, *No.* 15; *Smith* agt. *Payne*, 6 *T. R.*, 152; *In re Donaldson*, 1 *Am. L. T. B.*, 5; *Smith* agt. *Buchanan*, *Alby. Law Jour.*, *Feb.* 4, 1871; *Wilson* agt. *City Bank of St. Paul*, 5 *N. B. R.*, 270, (*No.* 8); *Scammon* agt. *Cole*, *Ibid.*)